10-4519-cv (L)
Linde v. Arab Bank, PLC

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: March 6, 2012          Decided: January 18, 2013)

Docket Nos. 10-4519-cv(L), 10-4524-cv(CON)

COURTNEY LINDE, ET AL.,

*Plaintiffs-Appellees*,

v.

ARAB BANK, PLC,

*Defendant-Appellant.*[*]

BEFORE: CHIN and CARNEY, *Circuit Judges*, and UNDERHILL, *District Judge*.[**]

Appeal from an order of the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*) imposing discovery sanctions against defendant Arab Bank. Plaintiffs are U.S. and foreign nationals pursuing claims under the Anti-Terrorism Act, 18 U.S.C. § 2333, and Alien Tort Claims Act, 28 U.S.C. § 1350, alleging in relevant part that the Bank knowingly and purposefully supported foreign terrorist organizations between 1995 and 2004 by providing financial services to those organizations. The District Court ordered the Bank to produce certain documents that the Bank argues are protected by foreign bank secrecy laws, and, pursuant to Federal Rule of Civil Procedure 37, imposed sanctions for the Bank's persistent failure to comply. The sanctions order included a jury instruction permitting the jury to infer that (1) the Bank provided financial services to foreign terrorist organizations, and (2) it did so knowingly and purposefully. We conclude

---

[*] Consistent with the parties' stipulation so ordered by this Court on March 25, 2011, ECF No. 86, we use the short-form caption for the purpose of publishing this opinion.

[**] The Honorable Stefan R. Underhill, United States District Judge for the District of Connecticut, sitting by designation.

that the sanctions order is not a reviewable collateral order, and that accordingly, we lack jurisdiction over the Bank's appeal. We further conclude that the Bank is not entitled to a writ of mandamus vacating the District Court's sanctions order. The appeal is therefore DISMISSED, and the petition for a writ of mandamus is DENIED.

STEPHEN M. SHAPIRO, Mayer Brown LLP, Chicago, IL (Michele L. Odorizzi, Timothy S. Bishop, Jeffrey W. Sarles, Mayer Brown LLP, Chicago, IL; Philip Allen Lacovara, Mayer Brown LLP, New York, NY; Kevin Walsh, Douglas W. Mateyaschuk, II, DLA Piper LLP (U.S.), New York, NY, *on the brief*), *for Defendant-Appellant*.

PETER RAVEN-HANSEN, Osen LLC, Oradell, NJ (Gary M. Osen, Aaron Schlanger, Osen LLC, Oradell, NJ; Mark S. Werbner, Joel Israel, Sayles Werbner, Dallas, TX; Michael E. Elsner, John M. Eubanks, Vincent I. Parrett, Motley Rice LLC, Mount Pleasant, SC; Steven M. Steingard, Stephen H. Schwartz, Neil L. Glazer, Kohn, Swift & Graf, P.C., Philadelphia, PA; James P. Bonner, Stone Bonner & Rocco LLP, New York, NY; David S. Stone, Stone & Magnanini LLP, Short Hills, NJ, *on the brief*), *for Plaintiffs-Appellees*.

Christopher M. Curran, White & Case LLP, New York, NY (Nicole E. Erb, White & Case LLP, New York, NY, *on the brief*), *for* The Hashemite Kingdom of Jordan as *amicus curiae in support of Defendant-Appellant*.

SUSAN L. CARNEY, *Circuit Judge*:

This case concerns claims brought by victims and families of victims of terrorist attacks committed in Israel between 1995 and 2004. Proceeding under the Anti-Terrorism Act, 18 U.S.C. § 2333, and the Alien Tort Claims Act, 28 U.S.C. § 1350, plaintiffs seek monetary damages from Arab Bank, PLC ("Arab Bank" or the

2

"Bank"), a large bank headquartered in Jordan, with branches in New York, throughout the Middle East, and around the world. According to plaintiffs, Arab Bank provided financial services and support to terrorists during this period, facilitating the attacks that caused them grave harm.

At stake in this litigation are interests both wide-ranging and weighty. They include plaintiffs' and the United States' interests in seeking redress for and deterring acts of international terrorism; the Bank's interests in avoiding substantial damages and the stigma of being labeled a supporter of terror; and foreign jurisdictions' interests in enforcing their bank privacy laws. Although the questions before us implicate some of these broader interests, our analysis turns on our own limited jurisdiction, either through interlocutory appeal or mandamus, to consider issues that have arisen during the course of litigation that is ongoing in the district court.

This appeal is brought by defendant Arab Bank from the District Court's orders imposing sanctions pursuant to Federal Rule of Civil Procedure 37(b) for the Bank's failure to comply with several of that court's discovery-related orders. In a separate action consolidated with the instant appeal, the Bank has also petitioned our Court under 28 U.S.C. § 1651 for a writ of mandamus directing vacatur of the District Court's sanctions order.

That order was entered following the Bank's repeated failures, over several years and despite multiple discovery orders, to produce certain documents relevant to plaintiffs' case. The Bank argues that the documents are covered by foreign bank

3

secrecy laws such that their disclosure would subject the Bank to criminal prosecution and other penalties in several foreign jurisdictions. The sanctions order takes the form of a jury instruction that would permit – but not require – the jury to infer from the Bank's failure to produce these documents that the Bank provided financial services to designated foreign terrorist organizations, and did so knowingly. The order also precludes the Bank from introducing for the jury's consideration certain evidence related to the undisclosed materials.

On appeal, the Bank argues primarily that these sanctions are unduly harsh. It contends that the jury instructions will predetermine the outcome of the litigation, and that, in imposing the sanctions order, the District Court assigned inadequate weight to the interests of Lebanon, Jordan, and the Palestinian Monetary Authority in enforcing their banking privacy laws and to the hardship faced by the Bank in addressing competing legal dictates of the United States and foreign authorities. The Bank also submits that entry of the sanctions order constituted an abuse of the District Court's discretion in that the order is alleged to violate due process and to rest on erroneous factual findings.

Before we may reach the merits of these arguments, however, we must determine whether our Court has jurisdiction to hear this appeal. Because 28 U.S.C. § 1291 vests us with jurisdiction to review "final decisions" of the district court, ordinarily a decision or order is appealable only after the district court has entered judgment. See Mohawk Indus., Inc. v. Carpenter, 130 S. Ct. 599, 603 (2009). Since the questions raised here relate to pre-trial discovery, and the

4

litigation is ongoing in the District Court, no one disputes that the District Court's sanctions ruling is not literally a "final decision."

The Bank urges us to conclude, however, that the court's order falls within the "small category of decisions that, although they do not end the litigation, must nonetheless be considered 'final.'" Swint v. Chambers County Comm'n, 514 U.S. 35, 42 (1995). The order is of such gravity and of such a type, insists the Bank, that, independent of future proceedings in the District Court, it virtually dictates the outcome of the case. See generally Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949). Plaintiffs argue, in contrast, that the order is not appealable because it bears on questions inseparable from the merits of this case and because appellate review after final judgment will provide the Bank a sufficient avenue for relief.

In the alternative, the Bank urges by means of a petition for mandamus that we vacate the District Court's sanctions order. It contends that the order constitutes such a clear abuse of discretion that it cannot be allowed to stand. Plaintiffs, for their part, dispute that this is a suitable case for granting a writ of mandamus, maintaining principally that the Bank does not have a "clear and indisputable" right to the relief it seeks. See Cheney v. U.S. Dist. Court, 542 U.S. 367, 380-81 (2004).

For the reasons set forth below, we conclude that the sanctions order is not a reviewable collateral order, and we therefore dismiss the Bank's appeal for want of jurisdiction. We conclude, further, that this is not an appropriate case for issuance of the extraordinary writ of mandamus, since we agree with plaintiffs that the Bank

5

has not established (among other factors) that it has a "clear and indisputable right" to such drastic relief or that review after final judgment will not provide adequate relief. See id. at 381. We therefore DISMISS the appeal and DENY the petition for mandamus.

## BACKGROUND

1.  Plaintiffs' Claims

Plaintiffs are thousands of individual victims and family members of victims injured or killed in terrorist attacks occurring in Israel and the Palestinian Territories between 1995 and 2004.[1] Arab Bank is headquartered in Jordan and maintains a branch in New York City. Plaintiffs allege that during the relevant period (much of which is commonly referred to as the "Second Intifada"), the Bank knowingly, intentionally, and unlawfully "solicit[ed], collect[ed], transmitt[ed], disburs[ed], and provid[ed] the financial resources that allowed" foreign terrorist organizations operating within Israel and the Palestinian Territories "to flourish and to engage in a campaign of terror, genocide, and crimes against humanity in an

---

[1] Ten similar suits brought against Arab Bank were consolidated by the District Court for discovery and other pretrial proceedings. Linde v. Arab Bank, PLC, 269 F.R.D. 186, 186 n.1 (E.D.N.Y. 2010). This appeal is taken from all ten consolidated cases. The path of this litigation is charted in a number of District Court opinions and orders. See Linde v. Arab Bank, PLC, 353 F. Supp. 2d 327 (E.D.N.Y. 2004) ("Linde I") (finding that plaintiffs did not have a private right of action allowing for injunctive relief); Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) ("Linde II") (denying, in large part, Arab Bank's motion to dismiss); Linde v. Arab Bank, PLC, 463 F. Supp. 2d 310 (E.D.N.Y. 2006) ("Linde III") (Magistrate Judge holding that bank secrecy laws in Jordan, Lebanon and Palestinian Territories did not excuse Arab Bank from order to produce documents covered by those laws); Linde v. Arab Bank, PLC, No. 04-civ-2799, 2009 WL 8691096 (E.D.N.Y. June 1, 2009) ("Linde IV") (Magistrate Judge recommending sanctions); Linde v. Arab Bank, PLC, 269 F.R.D. 186 (E.D.N.Y. 2010) ("Linde V") (District Court issuing sanctions).

attempt to eradicate the Israeli presence from the Middle East landscape."[2] Providing such financial services to foreign terrorists violates U.S. law. See 18 U.S.C. § 2339A(a) (proscribing the provision of "material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out [any one of a number of expressly prohibited acts of terrorism]").

Plaintiffs' claims rest on two factual theories. First, plaintiffs allege that the Bank assisted in administering a "death and dismemberment benefit plan" pursuant to which the Saudi Committee for the Support of the Intifada Al Quds ("Saudi Committee") made cash payments to terrorists and their families.[3] The payments were allegedly designed to provide an incentive for suicide bombers and others who killed or injured plaintiffs and their kin. Plaintiffs allege that the families of terrorists would "claim this reward by obtaining an official certification of their deceased relative's status as a martyr, which include[d] an individualized martyr identification number."[4] Plaintiffs further allege that the Saudi Committee and Arab Bank required that beneficiaries provide this "martyr certificate" or "death certificate" to Arab Bank to demonstrate their entitlement to benefits.[5]

Second, plaintiffs allege that the Bank provided financial services to various entities and individuals acting on behalf of Hamas and other State Department-

---

[2] Linde V, 269 F.R.D. at 191.

[3] Linde IV, 2009 WL 8691096, at *6.

[4] Linde I, 384 F. Supp. 2d at 577.

[5] Id.

designated foreign terrorist organizations.[6]  These services included, for example, maintaining bank accounts, making wire transfers, and otherwise facilitating the movement of funds.

Plaintiffs are U.S. and foreign nationals.  The U.S.-national plaintiffs assert claims arising under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and the foreign-national plaintiffs request relief under the Alien Tort Claims Act, 28 U.S.C. § 1350, also known as the Alien Tort Statute ("ATS").  Each group of plaintiffs seeks monetary damages.

### 2. The Discovery Disputes and Arab Bank's Limited Document Productions

Early in the litigation, in 2005, plaintiffs requested that the Bank produce documents related to various specified accounts maintained at the Bank.  The material sought concerned primarily organizations designated as "foreign terrorist organizations" by the United States government, and entities and individuals allegedly affiliated with those organizations.[7]  During 2005, Magistrate Judge Victor V. Pohorelsky, to whom this case was referred for discovery, issued a series of focused production orders that required Arab Bank to turn over specific banking information concerning known or suspected terrorists.  For example, in November

---

[6] Id.  "Hamas" is an acronym for the Arabic phrase "Harakat al-Muqawama al-Islamiya," sometimes translated as the "Islamic Resistance Movement."  Country Reports on Terrorism 2010, U.S. Dep't of State, Aug. 18, 2011, *available at* http://www.state.gov/j/ct/rls/crt/2010/170264.htm. Accordingly, the movement's title is sometimes printed in capital letters as "HAMAS."  See Linde II, 384 F. Supp. 2d at 576.  In accordance with common usage, we refer to it here as "Hamas."

[7] See 8 U.S.C. § 1189 (defining process pursuant to which the Secretary of State may designate an entity as a "foreign terrorist organization").  We sometimes refer to such organizations here as "FTOs."

2005, the Magistrate Judge ordered that Arab Bank produce information related to a specific account at the Bank's Lebanese branch, into which a website allegedly affiliated with terrorist groups had purportedly requested that funds be transferred.[8] Arab Bank asserted that the request was subject to bank secrecy laws in Lebanon and that permission to produce the relevant material was required from Lebanese regulatory authorities. In 2006, Arab Bank received permission from Lebanon to disclose information related to this account, and did so.[9]

In February 2006, plaintiffs moved the District Court to compel the Bank to produce a much broader swath of previously-requested documents. Later that year, the Magistrate Judge granted plaintiffs' motion, and in March 2007, the District Court affirmed the production order.[10] Among the various materials the Magistrate Judge ordered Arab Bank to disclose were documents related to alleged transfers from the Saudi Committee to terrorists, including "documents identifying the account numbers and account holders of the accounts from which the payments were disbursed" and "documents identifying the account numbers and account holders of the accounts into which the payments were disbursed."[11]

---

[8] Supplemental Appendix ("Supp. App.") 15.

[9] Linde III, 463 F. Supp. 2d at 316.

[10] Linde III, 463 F. Supp. 2d 310 (Magistrate Judge decision); see also Linde v. Arab Bank, No. 04-cv-2799, 2007 WL 812918 (E.D.N.Y. Mar. 14, 2007) (affirming Magistrate Judge's decision).

[11] Supp. App. 18-19.

9

In deciding the motion to compel, the Magistrate Judge and District Court analyzed several factors. Most critically, they balanced (on the one hand) the interests of foreign governments in enforcing their laws and the potential hardship created for the Bank by its conflicting legal obligations, with (on the other hand) the interests of the United States in enforcing its laws and plaintiffs' need for the material in pursuing their claims. The balancing analysis followed the guidance provided by § 442 of the Restatement (Third) of Foreign Relations Law of the United States (1987) (the "Restatement"), which has long provided the courts a thoughtful source of authority for addressing discovery issues in this context. See, e.g., In re Grand Jury Proceedings, 532 F.2d 404, 407 (5th Cir. 1976) (adopting the "Restatement position" as a means of "determining whether the United States or . . . the Cayman Islands' legal command will prevail" with regard to whether a noncitizen could be compelled to testify before a U.S. grand jury in violation of Cayman Islands bank secrecy laws). Section 442(1)(c) advises courts to consider five factors when "deciding whether to issue an order directing production of information located abroad":

> [i] the importance to the . . . litigation of the documents or other information requested; [ii] the degree of specificity of the request; [iii] whether the information originated in the United States; [iv] the availability of alternative means of securing the information; and [v] the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement § 442(1)(c). Using this framework, the court here determined that the

10

importance of the documents to the litigation and the substantial public interest in compensating victims of terrorism and combating terrorism – interests shared by the United States and foreign sovereigns – outweighed the foreign sovereigns' interests in banking privacy.[12]

Before entering its production order, however, the Magistrate Judge invited Arab Bank to seek permission from the cognizant authorities in the relevant foreign states[13] to produce the responsive material. See Restatement § 442(2)(a) ("[A] court or agency in the United States may require the person to whom the order is directed to make a good faith effort to secure permission from the foreign authorities to make the information available."). As discussed above, a similar waiver had been granted by Lebanese authorities earlier in 2006.[14]

Arab Bank sought such a waiver, but in September 2007, the authorities in Jordan, Lebanon, and the Palestinian Territories denied the Bank's request.[15] Pointing to this denial, the Bank continued to refuse to produce the materials assertedly covered by foreign bank secrecy laws. Plaintiffs continued to contend that the materials at issue were necessary to their case.

---

[12] See Linde III, 463 F. Supp. 2d at 315-16, aff'd, 2007 WL 812918 (E.D.N.Y. Mar. 14, 2007).

[13] For convenience, throughout this opinion we sometimes refer to Lebanon, Jordan, and the Palestinian Monetary Authority as "the foreign states," "the foreign nations," or "the foreign sovereigns."

[14] See Linde III, 463 F. Supp. 2d at 316.

[15] See Linde V, 269 F.R.D. at 194.

11

During these protracted proceedings, plaintiffs acquired numerous documents related to their discovery requests, some from the Bank and some from other sources. The quality and quantity of the documents bear on both plaintiffs' need for additional discovery and the likely effect of the sanctions order. The material was produced in the following ways.

First, after initially resisting their motion to compel, the Bank disclosed to plaintiffs documents regarding certain fund transfers effected through the New York branch of Arab Bank.[16] The Bank had earlier disclosed these documents to two divisions of the United States Department of the Treasury – the Office of the Comptroller of the Currency ("OCC") and the Financial Crimes Enforcement Network – in the course of investigations by those divisions of Arab Bank's New York branch for the Bank's alleged failure to monitor fund transfers adequately for suspicious activity.[17]

Second, through sources independent of Arab Bank but not apparent from the record, plaintiffs obtained documents that the Bank initially produced to the United States Department of Justice ("DOJ") during its prosecution of the Holy Land Foundation for Relief and Development ("Holy Land Foundation") in the Northern District of Texas on money-laundering charges.[18] Originally established as the "Occupied Land Fund," the Holy Land Foundation has described itself as "the

---

[16] The corporate relationship of the branch to the headquarters is unclear from the record.

[17] Linde V, 269 F.R.D. at 193; see also Supp. App. 80.

[18] Linde V, 269 F.R.D. at 193.

largest Muslim charity in the United States," but in the early 2000s the Treasury Department found that it was "closely linked" with Hamas.[19]  Plaintiffs allege in this suit that Arab Bank laundered money for the Holy Land Foundation as part of the Foundation's efforts to raise funds for Hamas.[20]  The documents obtained by plaintiffs include documents formerly located at Arab Bank-Palestine and Arab Bank-London that are responsive to plaintiffs' initial discovery requests.[21]

Third, after numerous production orders, Arab Bank obtained permission from the Saudi Committee to disclose documents "relating to transactions handled by [Arab Bank] on the Saudi Committee's behalf."[22]  Pursuant to the Saudi Committee's permission, Arab Bank now claims to have produced for plaintiffs approximately 180,000 "documents" reflecting "payment instructions for *every* payment originated by the Saudi Committee and made to a beneficiary by Arab Bank . . . [, including] the date, value and currency of the transfer; the name and number of the transferring bank; the name and number of the covering bank; the name of the transferor; and the name and address of every beneficiary."[23]  The Bank further contends that it has produced every internal document in its custody or

---

[19] Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 159-60 (D.C. Cir. 2003) (internal quotation marks omitted).

[20] Linde V, 269 F.R.D. at 192.

[21] Appellant's App. 1045.

[22] Linde IV, 2009 WL 8691096, at *4.  With this license, the Bank is excused from complying with otherwise applicable bank secrecy laws, it appears.  Id.

[23] Appellant's App. 1043.

13

possession, in any branch, that relates to the Saudi Committee. According to Arab Bank, these documents include internal correspondence related to transfers the Saudi Committee made to recipients located in the Palestinian Territories. They also contain information related to 122 transfers through the Saudi Committee that were especially probative, in plaintiffs' view, because they identified the beneficiary of the transfer solely by his or her relationship to another individual (*i.e.*, "father of ____"). Before performing these transfers, Arab Bank received further information about each of the beneficiaries but – the Bank asserts – never requested "death certificates" or "martyr certificates" from beneficiaries. Arab Bank asserts that in discovery it produced the documents that these beneficiaries had provided to the Bank to establish their entitlement to payment, with the names of the beneficiaries redacted.

Fourth, as mentioned above, Arab Bank received permission from the Lebanese Special Investigation Commission to disclose, and in fact later did disclose to plaintiffs, documents relating to one account at a Lebanese branch of Arab Bank that was apparently "held in the name of an individual who has been identified as a high-ranking member of Hamas."[24]

Plaintiffs thus acquired a substantial volume of relevant material. Arab Bank continued, however, to refuse to produce documents responsive to several requests of critical importance to plaintiffs' case. These included records regarding

---

[24] Linde IV, 2009 WL 8691096, at *4.

14

ten specific accounts the Bank is alleged to maintain for certain named foreign terrorist organizations; general account records for other named organizations that, according to plaintiffs, are linked to terrorism; and, finally, account records for the beneficiaries of Saudi Committee transfers.[25]  Regarding the last category of records, Arab Bank has argued that even though the Saudi Committee may provide permission to Arab Bank to disclose documents related to payments "originated by the Saudi Committee," Arab Bank may not disclose "account records" – including account numbers, account statements, and certain account-holder identifying information – "of all the tens of thousands of Saudi Committee beneficiaries" without violating bank secrecy laws.[26]

### 3.    The Sanctions Order

In late December 2007, over two years after their initial discovery request, plaintiffs moved for sanctions under Federal Rule of Civil Procedure 37(b).  Rule 37(b) authorizes district courts to impose sanctions upon a party for failure to comply with a discovery order, so long as those sanctions are "just."  The Rule identifies potential sanctions for disobeying discovery orders.  These include: "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action"; "prohibiting the disobedient party from supporting or opposing designated claims or defenses"; and "rendering a default judgment."  Fed. R. Civ. P. 37(b)(2).

---

[25]  See Linde V, 269 F.R.D. at 198-99.

[26] Appellant's App. 1071.

15

In June 2009, in the absence of any further substantial production by Arab Bank, the Magistrate Judge issued a Report & Recommendation addressing sanctions. Initially, the Magistrate Judge recommended that the District Court, among other sanctions, should "deem[ ] established . . . [that] between 2000 and 2004 the defendant provided financial services on behalf of the Saudi Committee" to various terrorists and terrorist organizations.[27] The Magistrate Judge later amended this recommendation, having concluded that he had initially overlooked that documents produced by Arab Bank regarding the Saudi Committee transfers indeed included "information about the identity of each recipient of such a payment, the amount and timing of each payment, and other information concerning each payment transaction."[28] For this reason, the Magistrate Judge recommended that the District Court instruct the jury that it could but need not infer that Arab Bank provided financial services to the Saudi Committee and FTOs.[29] The Magistrate Judge declined to recommend, however, either that the District Court deem established that Arab Bank knowingly and intentionally provided financial services to terrorist organizations or that the District Court instruct the jury that it could infer knowledge and intent from Arab Bank's failure to produce certain documents. The Magistrate Judge explained that, in his view, "There has been no showing that

---

[27] Linde IV, 2009 WL 8691096, at *12.

[28] Order Modifying Rep. and Recommendation at 3, Linde v. Arab Bank, PLC, No. 04-cv-5449 (S.D.N.Y. June 18, 2009), ECF No. 546.

[29] Id. at 4.

16

the withheld evidence would be likely to provide direct evidence of the knowledge and intent of the Bank in providing the financial services at the heart of this case."[30]

In July 2010, the District Court adopted the Magistrate Judge's Report & Recommendation in part and imposed the sanctions order now at issue in this Court. The sanctions order took the form, first, of instructions the District Court ruled it will give to the jury. The court will instruct the jury that, based on Arab Bank's failure to produce documents, the jury may – but need not – conclude both that Arab Bank provided financial services to foreign terrorist organizations and that it did so knowingly and purposefully.[31] The Bank's actions and intent, of

---

[30] Linde IV, 2009 WL 8691096, at *8.

[31] The District Court's complete statement describing the sanctions imposed is as follows:

> At trial, the jury will be instructed that, based on defendant's failure to produce documents, it may, but is not required to, infer: (1) that defendant provided financial services to organizations designated by the United States as Foreign Terrorist Organizations, and to individuals associated with the FTOs; (2) that defendant processed and distributed payments on behalf of the Saudi Committee to terrorists, including those affiliated with named terrorist organizations and those who are unaffiliated, their relatives, or representatives; and (3) that defendant did these acts knowingly and purposefully. In addition, (4) defendant is precluded from making any argument or offering any evidence regarding its state of mind or any other issue that would find proof or refutation in withheld documents; (5) all requests for admissions in plaintiffs' First Set of Requests for Admissions which defendant refused to answer on foreign bank secrecy grounds are deemed admitted, and any documents referred to in those requests, which plaintiffs obtained from sources other than defendant, are deemed authentic and are admissible as such at trial; and (6) defendant is prohibited from introducing in pre-trial motions or at trial any evidence withheld on foreign bank secrecy grounds.

Linde V, 269 F.R.D. at 205. The District Court adopted the so-called "state of mind sanction" – the instruction that advises the jury that it may (but need not) conclude that Arab Bank acted knowingly and purposefully. See Linde V, 269 F.R.D. at 194.

17

course, lie at the core of its ATA and ATS liability.[32]

The District Court carefully explained its decision to impose this sanction. It noted that many of the documents that plaintiffs had already obtained tended to support the inference that Arab Bank knew that its services benefited terrorists.[33] According to the District Court, these documents included (1) Saudi Committee spreadsheets listing beneficiaries of transfers and the dates and causes of the related deaths; and (2) documents from Arab Bank's Lebanon branch that suggested that "on at least three occasions in 2000, Arab Bank officials approved the transfer of funds into [an account at that branch] despite the fact that the transfers listed" known terrorists as beneficiaries.[34] As a consequence of the evidentiary gap created by Arab Bank's non-disclosure, the court reasoned, plaintiffs would be "hard-pressed to show that . . . [these] transfers were not approved by mistake, but instead are representative of numerous other transfers to terrorists."[35] The permissive inference instruction will, according to the District Court, help to rectify this evidentiary imbalance.

---

[32] The parties dispute the potential scope of the Bank's liability under the ATA and the ATS, statutes whose meaning has been, and continues to be, subject to judicial interpretation and public debate. See Linde II, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) (denying motion to dismiss ATA claims); cf. Kiobel v. Royal Dutch Petroleum Co., 132 S. Ct. 1738 (2012) (restoring Kiobel to the Supreme Court's calendar for reargument during the October 2012 term). We conclude – as explained in the text – that even assuming Arab Bank's state of mind is central to that liability, the sanctions order is not reviewable at this stage.

[33] Linde V, 269 F.R.D. at 199, 203.

[34] Id. at 203.

[35] Id.

18

Additionally, the District Court precluded Arab Bank from using as evidence at trial any material that the Bank withheld on bank secrecy grounds, and from making arguments with respect to its state of mind that "would find proof or refutation in the withheld documents."[36]  The District Court observed in support of its decision that the Bank "cannot argue that it had no knowledge a certain Bank customer was a terrorist if it did not produce that person's complete account records.  To permit the Bank to make such an argument would allow it to profit from evidentiary gaps that it chose to create."[37]

After the District Court denied Arab Bank's motions to reconsider the sanctions order and to certify an interlocutory appeal, Arab Bank noticed the appeal and filed the petition for mandamus that are before us now.

## DISCUSSION

### I.    Collateral Order Review

Federal courts of appeals "have jurisdiction of appeals from all final decisions of the district courts of the United States."  28 U.S.C. § 1291.  Ordinarily, we have jurisdiction to consider only those appeals brought after the district court has entered final judgment.  Cunningham v. Hamilton County, 527 U.S. 198, 203 (1999).  But under the judicially-developed collateral order doctrine, first recognized by the Supreme Court in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 (1949), our jurisdiction under § 1291 also includes appeals from "a small category of

---

[36] Id. at 204.

[37] Id.

19

orders that do not terminate the litigation," but that are nonetheless "final." See Cunningham, 527 U.S. at 204; see also Will v. Hallock, 546 U.S. 345, 349 (2006) ("The collateral order doctrine . . . is best understood not as an exception to the final decision rule laid down by Congress in § 1291, but as a practical construction of it." (internal quotation marks and citation omitted)). Pursuant to Cohen, a district court's order is appealable before judgment has entered only if (1) it is conclusive; (2) it "resolve[s] important questions separate from the merits"; and (3) it is "effectively unreviewable on appeal from the final judgment in the underlying action." Swint, 514 U.S. at 42 (citing Cohen, 337 U.S. at 546).

The class of collateral orders as to which interlocutory review is permitted under § 1291 must remain "narrow and selective in its membership," so that the collateral order doctrine does not "overpower the substantial finality interests [that] § 1291 is meant to further." Will, 546 U.S. at 350.[38] These interests recognize the district court's central role in managing ongoing litigation, and seek to avoid the inefficiencies that would be created by permitting a court of appeals to review issues before the district court has had an opportunity to address all of the case's often interrelated questions. Mohawk Indus., Inc., 130 S. Ct. at 605. But these interests protect more than judicial resources: the Supreme Court has cautioned that the conditions that allow for collateral review "are stringent" in order also to serve "the

[38] We note that 28 U.S.C. § 1292, "Interlocutory decisions," expressly provides for appellate review of several additional categories of orders before entry of a final judgment, and enables the Supreme Court to add other limited categories, in the exercise of its sound discretion. Id. § 1292(e). These alternative paths to interlocutory review do not bear on our analysis here, however.

20

sensible policy of avoiding the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise." Will, 546 U.S. at 349-50 (internal quotation marks, citations, and alterations omitted). Section 1291 recognizes these concerns by providing appellate courts jurisdiction to review "final decisions."

We have identified only one instance in which the Supreme Court has directly addressed the appealability of a district court's imposition of Rule 37 sanctions. In Cunningham, the Court held that the court of appeals lacked jurisdiction to consider an attorney's interlocutory appeal of the district court's monetary sanction, imposed under Rule 37(a)(5),[39] requiring that the attorney pay the opposing party's fees and costs related to a discovery dispute. 527 U.S. at 200-203.

In analyzing whether the sanctions order there was immediately appealable, the Court applied the three-pronged Cohen test. The respondent conceded the first prong of the Cohen test, that "the sanctions order was conclusive." Id. at 205. As to the second, the Court noted that "a Rule 37(a) sanctions order often will be inextricably intertwined with the merits of the action," reasoning that an

---

[39] The Court's opinion refers to Rule 37(a)(4), which was recodified as Rule 37(a)(5) in 2007. See Robbins & Myers, Inc. v. J.M. Huber Corp., No. 01-cv-201, 2010 WL 3992215, at *4 n.10 (W.D.N.Y. Oct. 12, 2010). Rule 37(a)(5) provides, inter alia, that a district court may order a "party or deponent whose conduct necessitated [a motion to compel or for sanctions], the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."

21

"evaluation of the appropriateness of sanctions may require the reviewing court to inquire into the importance of the information sought or the adequacy or truthfulness of a response." Id. at 205. While acknowledging that "[p]erhaps not every discovery sanction will be inextricably intertwined with the merits," it declined to undertake a particularized review of the facts in the case before it, observing instead that it had "consistently eschewed a case-by-case approach to deciding whether an order is sufficiently collateral" in favor of a categorical approach in which it focused on classes of orders in determining reviewability. Id. at 206. As to the third prong, the Court held that "[e]ven if the merits were completely divorced from the sanctions issue," the order would be unappealable as an interlocutory matter because it could be effectively reviewed after the case had finally been resolved in the district court. Id. at 206-09.

Although the metes and bounds of the category established by Cunningham have yet to be firmly set, we have to date treated Cunningham as prohibiting interlocutory appeals of Rule 37 sanctions, at least in cases where those sanctions' primary component is attorney's fees or costs imposed against an attorney under Rule 37(a). See, e.g., New Pac. Overseas Grp. (U.S.A.) Inc. v. Excal Int'l Dev. Corp., 252 F.3d 667, 670 (2d Cir. 2001) (per curiam). Our sister circuits appear to have adopted a similar approach. See, e.g., Banks v. Office of the Senate Sergeant-At-Arms & Doorkeeper of the U.S. Senate, 471 F.3d 1341, 1347-48 (D.C. Cir. 2006). Furthermore, sound authority advises that parties seeking interlocutory review of discovery sanctions short of default judgment have rarely prevailed in arguing that

22

the appellate court has jurisdiction under the collateral order doctrine.  See

generally 15B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal

Practice and Procedure § 3914.23 (2d ed. 1992) ("Sanctions imposed for violation of

discovery orders might seem plausible candidates for appeal on the theory that the

sanction is severable from the continuing proceedings.  The opportunities for

appeal, however, have generally been limited to sanctions that conclude the

proceeding or that involve nonparties.").

Even were we unconstrained by Cunningham's "categorical" holding, we

conclude that the established hurdles to interlocutory review bar the Bank's appeal.

Regarding the first prong of the Cohen test, the District Court appears to have

conceived of its order as "conclusive."  See, e.g., Linde V, 269 F.R.D. at 205 (stating

that "[a]t trial, the jury will be instructed" that it may infer that the Bank provided

financial services to terrorist organizations and that it did so knowingly and

purposefully (emphasis added)).  The District Court is free, of course, to change its

mind.  See Fed. R. Civ. P. 54(b).  But we see no reason to question the court's

current assessment, because the sanctions order is both intertwined with the merits

of this case and is effectively reviewable after final judgment.  See Digital Equip.

Corp. v. Desktop Direct, Inc., 511 U.S. 863, 868-69 (1994) (expressly deciding not to

address whether an order was conclusive because it was also not "effectively

unreviewable" upon final judgment).

With respect to the second prong, the sanction imposed here is "inextricably

intertwined with the merits of the action."  Cunningham, 527 U.S. at 205.

23

Determining whether the District Court abused its discretion would require us, among other things, to evaluate the importance of the requested documents to plaintiffs' case and the adequacy of Arab Bank's production to date. See id. For example, we might need to assess the District Court's findings that Arab Bank's disclosure of account information subject to the waiver provided by Lebanon related to "only one of eleven accounts that the [Bank] admits it maintained for [terrorist organizations]," Linde V, 269 F.R.D. at 197-98, and that the Bank "produced . . . incomplete account information for seven charitable organizations alleged to be terrorist fronts that it had previously produced" during the Department of Justice's prosecution of the Holy Land Foundation, id. at 198. If we concurred in these characterizations, we would then need to consider the significance of these failures and their relevance to the legal issues at stake in this litigation. See, e.g., S. New England Tel. Co. v. Global NAPs, Inc., 624 F.3d 123, 148 (2d Cir. 2010) (finding that the "subject of the discovery orders" was "obviously germane" to the merits of the case in evaluating whether default judgment was an appropriate Rule 37(a) sanction).

In fact, the sanctions order in this case is intertwined with the merits of the litigation to an even greater degree than the sanctions order in Cunningham. The Supreme Court determined that the order in that case was unreviewable on interlocutory appeal because the appellate court would likely have had to consider the importance of the information sought relative to the merits of the case. But the sanction itself – a monetary penalty imposed against an attorney and not one of the

24

parties – was ancillary to the resolution of the litigation. By contrast, here the District Court imposed a sanction that bears directly on the resolution of the merits of this case, and in determining on appeal whether the District Court abused its discretion, we would likely take into account the probable effect of the sanction on the jury's verdict. See id. at 147 (considering propriety of default judgment as sanction). For example, Arab Bank particularly objects to the sanction in that it permits the jury to infer that Arab Bank provided aid to terrorist organizations "knowingly and purposefully." See Linde V, 269 F.R.D. at 205. Evaluating the Bank's argument would require us to analyze the impact such a permissive inference would have on the litigation, perhaps considering the likelihood that the jury would find knowledge and purpose on the evidence presented absent such an instruction.

As for the third prong of the Cohen test, this is not a case in which the order from which Arab Bank seeks interlocutory appeal is "effectively unreviewable on appeal from the final judgment in the underlying action." Swint, 514 U.S. at 42. To the extent that the ultimate harm to Arab Bank caused by the instruction might be a jury finding in the plaintiffs' favor, that harm could plainly be remedied after trial: a jury verdict entered upon an erroneous instruction of material importance and to which a timely objection is made may be reversed if we conclude that the erroneous instruction prejudiced the party challenging the jury's verdict. See, e.g., Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 147-49 (2d Cir. 2010); Cweklinsky v. Mobil Chem. Co., 364 F.3d 68, 74 (2d Cir. 2004).

25

The Bank argues, however, that even if on an appeal from an adverse verdict this Court were to find error in the District Court's sanctions order, it would be too late to reverse the substantial financial consequences resulting from the reputational harm the Bank would sustain as a consequence of an adverse jury finding. But this concern hardly compels review under the collateral order doctrine. The possibility of reputational harm to the sanctioned attorney was also at stake in Cunningham, but the Supreme Court reasoned nonetheless that any interest the attorney may have had in resolving the matter quickly was trumped by the district court's interests in "structur[ing] a sanction in the most effective manner." Cunningham, 527 U.S. at 209. Although the institutional interests and magnitude of the harm allegedly at issue here may be different from the harm experienced by an individual attorney subject to a fine, the same reasoning applies. The collateral order doctrine respects the district court's role in managing litigation by barring "appeals, even from fully consummated decisions, where they are but steps towards final judgment in which they will merge." Cohen, 337 U.S. at 546. Like any litigant, Arab Bank may confront some reputational harm if the jury returns a verdict for its opponents, but the Bank's interest in avoiding this harm and the resulting financial consequences of an adverse jury verdict are easily outweighed by the judiciary's interest in preserving the district court's role in managing litigation.

The Bank contends that this application of the Cohen test will result in inefficiencies and a possible measure of unfairness to Arab Bank, but neither of these concerns alters our analysis. To be sure, if our Court were to decide on appeal

26

after final judgment that the District Court erred in imposing the sanctions, the parties will have already expended considerable resources. Moreover, it is conceivable that, as Arab Bank argues, it will experience substantial and immediate harm from an adverse jury verdict following the challenged instruction. These equitable considerations, however, do not bear on the inquiry called for by § 1291 and Cohen. As the Supreme Court has cautioned, "allowing appeals of right from nonfinal orders that turn on the facts of a particular case thrusts appellate courts indiscriminately into the trial process and thus defeats one vital purpose of the final-judgment rule – that of maintaining the appropriate relationship between the respective courts." Coopers & Lybrand v. Livesay, 437 U.S. 463, 476 (1978) (internal quotation marks omitted). The District Court imposed the sanctions here in the manner it deemed "most effective," Cunningham, 527 U.S. at 209, both in light of the seriousness of Arab Bank's noncompliance and the importance of the undisclosed information. Our intervention now would upset the "appropriate relationship" between this Court and the district courts whose decisions we review. Coopers & Lybrand, 437 U.S. at 476. And that relationship "is very much worth preserving." Id. (internal quotation marks omitted).

Furthermore, although § 1291 applies categorically, we are not powerless to account for these equitable considerations. Our system maintains an "escape hatch from the finality rule." SEC v. Rajaratnam, 622 F.3d 159, 171 (2d Cir. 2010) (internal quotation marks omitted). "If the trial court declines to stay enforcement of [an] order and the result is an exceptional hardship itself likely to cause an

27

injustice, a petition for writ of mandamus might bring the issue before the Court of Appeals. . . ." Cunningham, 527 U.S. at 211 (Kennedy, J. concurring). We turn now to evaluating this alternative path to appellate court jurisdiction.

## II.    Mandamus

The All Writs Act, 28 U.S.C. § 1651(a), empowers this Court to issue a writ of mandamus directing a district court to correct an erroneous order.[40] Mandamus, however, is a "drastic and extraordinary remedy," whose use is warranted only under "circumstances amounting to a judicial usurpation of power or a clear abuse of discretion" by the district court. Cheney, 542 U.S. at 380, 390 (internal quotation marks and citation omitted).

Three demanding requirements must be met before a court will issue a writ of mandamus. First, the petitioner must demonstrate that its "right to issuance of the writ is clear and indisputable." Cheney, 542 U.S. at 381 (internal quotation marks omitted). We issue the writ "only in exceptional circumstances amounting to a judicial usurpation of power *or* a clear abuse of discretion." In re City of New York, 607 F.3d 923, 943 (2d Cir. 2010) ("City of New York") (internal quotation marks omitted). "A district court abuses its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if it has rendered a decision that cannot be located within the range of permissible decisions. We will issue the writ only if a district court committed a clear and

---

[40] The All Writs Act provides, "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

indisputable abuse of its discretion in one of these ways." Rajaratnam, 622 F.3d at 171 (internal quotation marks omitted).

Second, "the party seeking issuance of the writ must have no other adequate means to attain the relief [it] desires." Cheney, 542 U.S. at 380 (internal quotation marks and alterations omitted). This requirement ensures that "the writ will not be used as a substitute for the regular appeals process." Id. at 380-81. In reviewing whether a petition meets the "no-adequate-alternative" requirement, we have examined whether issuing the writ would prevent an otherwise "irreparable harm." City of New York, 607 F.3d at 929.

Third, "even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." Cheney, 542 U.S. at 381; see also City of New York, 607 F.3d at 932. This requirement recognizes that "issuance of the writ is in large part a matter of discretion with the court to which the petition is addressed." Kerr v. U.S. Dist. Court, 426 U.S. 394, 403 (1976). In analyzing the appropriateness of issuing the writ in a given case, we consider a range of factors, including whether the petition presents "a novel and significant question of law . . . and . . . [whether it includes] the presence of a legal issue whose resolution will aid in the administration of justice." City of New York, 607 F.3d at 939 (internal quotation marks omitted) (ellipses in original); see also In re Long Island Lighting Co., 129 F.3d 268, 270 (2d Cir. 1997) (examining whether "the [mandamus] petition raises an issue of importance and of first impression"). But determining whether it is

29

appropriate in our discretion to issue the writ in a particular circumstance will hinge on different factors in different cases, and the presence of a novel question of law is not an absolute prerequisite. "The writ of mandamus could be appropriate, for example, if a district court ruling flagrantly misapplies a well-settled principle of law." City of New York, 607 F.3d at 940 n.17.

We address each of the relevant factors in turn. Although failure to satisfy any one of these prongs is dispositive of Arab Bank's petition, we review all three here, and conclude that none of the three supports issuance of the writ.

### A.    Arab Bank Is Not Clearly Entitled to a Writ of Mandamus.

The Bank argues that the sanctions order constitutes an abuse of discretion because it improperly balances the interests of the parties and nations affected by the discovery order; offends international comity; rests on clearly erroneous factual findings; and violates the Bank's due process rights.

We first address the Bank's challenges to the legal analysis and factual determinations undergirding the District Court's decisions to compel discovery and impose sanctions. We observe that when weighing the conflicting legal obligations of U.S. discovery orders and foreign laws, "[m]echanical or overbroad rules of thumb are of little value; what is required is a careful balancing of the interests involved and a precise understanding of the facts and circumstances of the particular case." United States v. First Nat'l City Bank, 396 F.2d 897, 901 (2d Cir. 1968). And, in light of this principle and our review of the District Court's analysis here, we conclude that even if the District Court incorrectly resolved any singular factual or

30

legal question, its overall balancing of the number of considerations does not warrant the issuance of a writ of mandamus.

Second, we examine Arab Bank's contention that the sanctions order here was so severe that it offended due process. On that count, we conclude that although the sanctions are substantial, they are not equivalent to a default judgment. The District Court's sanctions order cannot fairly be said to constitute a "judicial usurpation of power or a clear abuse of discretion" such as is necessary to warrant mandamus. City of New York, 607 F.3d at 943.

Our conclusion today should not be read, however, to preclude a future court from holding that the district court erred in imposing the sanctions. Because the writ of mandamus is such an extraordinary remedy, our analysis of whether the petitioning party has a "clear and indisputable" right to the writ is necessarily more deferential to the district court than our review on direct appeal. Cf. In re Volkswagen of America, Inc., 566 F.3d 1349, 1351 (Fed. Cir. 2009) (Mandamus relief is only appropriate "when the petitioner is able to demonstrate that the [district court committed] a 'clear' abuse of discretion [producing] a patently erroneous result. A suggestion that the district court abused its discretion, which might warrant reversal on a direct appeal, is not a sufficient showing to justify mandamus relief." (internal quotation marks omitted)). Further, as described below, our denial of the Bank's petition is also supported by our determinations that direct appeal will provide a sufficient means of relief and that mandamus is not appropriate under the circumstances here, questions that are not relevant in a direct appeal.

31

## 1.    Balancing of Interests

Arab Bank argues that the District Court failed to give adequate weight to the difficulties presented by the Bank's conflicting legal obligations, and to the interests of foreign governments in enforcing their bank secrecy laws. These arguments do not support issuance of a writ of mandamus. The District Court balanced the competing interests at issue and did not clearly abuse its discretion so as to warrant this extraordinary remedy by imposing discovery sanctions in response to the Bank's persistent noncompliance with the discovery order. See Linde V, 269 F.R.D. 186.

The Supreme Court long ago recognized the difficulties faced by parties for whom compliance with a U.S. discovery order would violate foreign law. See Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197 (1958) ("Rogers"). As the Rogers Court noted, "It is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign." Id. at 211. Nearly thirty years later, the Supreme Court reaffirmed this principle. See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court, 482 U.S. 522 (1987) ("Aérospatiale").

In both Rogers and Aérospatiale, however, the Court held that the operation of foreign law "do[es] not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that [law]." Aérospatiale, 482 U.S. at 544 n.29 (citing Rogers, 357 U.S. at

32

204-06).  Of particular relevance here, the <u>Rogers</u> Court suggested that "[i]t may be that in the absence of complete disclosure by petitioner, the District Court would be justified in drawing inferences unfavorable to petitioner as to particular events." <u>Rogers</u>, 357 U.S. at 213.  Ultimately "the District Court possesses wide discretion to proceed in whatever manner it deems most effective." <u>Id.</u>  In exercising that discretion where, as here, a party claims that foreign law prevents disclosure, the Court has called for a "particularized analysis," <u>Aérospatiale</u>, 482 U.S. at 543, and endorsed the factors recognized in a draft of what is now § 442 of the Restatement (Third) of Foreign Relations Law of the United States as "relevant to any [such] analysis," <u>id.</u> at 544 n.28.

Section 442 provides that, in determining whether to issue a production order for information located abroad, courts should consider "the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located."  Restatement § 442(1)(c).  Cases from our Circuit counsel that, when deciding whether to impose sanctions, a district court should also examine the hardship of the party facing conflicting legal obligations and whether that party has demonstrated good faith in addressing its discovery obligations.  See <u>In re Grand Jury Subpoena</u>, 218 F. Supp.

2d 544, 554 (S.D.N.Y. 2002); Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 523 (S.D.N.Y. 1987) (cited with approval by First America Corp. v. Price Waterhouse LLP, 154 F.3d 16, 22 (2d Cir. 1998)); see also United States v. Davis, 767 F.2d 1025, 1033-34 (2d Cir. 1985); cf. Restatement § 442(2)(b) ("[A] court . . . should not ordinarily impose sanctions of contempt, dismissal, or default on a party . . . except in cases . . . of failure to make a good faith effort [to comply].").

In arriving at the decision to compel discovery of the documents at issue, the District Court adopted the Magistrate Judge's conclusion that all but one of the § 442 factors supported disclosure; only the materials' origin outside the United States cut the other way. Linde III, 463 F. Supp. 2d at 315. Thus, the Magistrate Judge emphasized that the "discovery sought here is essential to the proof of the plaintiffs' case"; and that the United States' interests in vindicating the policies expressed in statutes providing "a civil tort remedy" for victims of international terrorism would be stifled by allowing defendants to conceal documents protected by foreign bank secrecy laws. Id. at 315.

In its opinion ordering sanctions, the District Court also addressed the hardship and good faith factors. With regard to Arab Bank's good faith, the District Court concluded that Arab Bank's contention "that it has acted in the utmost good faith" is "not supported by the record." Linde V, 269 F.R.D. at 199. The court observed that the Bank's "letters requesting permission from foreign banking authorities to disclose information . . . were calculated to fail." Id. at 199. The court also emphasized the "years of delay caused by defendant's refusals." Id. at 200.

34

Although Arab Bank insisted that it had evinced good faith by producing "hundreds of thousands of pages of documents" during this period, the District Court characterized this assertion as "devoid of context," because it was impossible to say how many thousands of responsive documents remained undisclosed, and the argument ignored that many of Arab Bank's disclosures were made only after the District Court had issued specific production orders. Id. at 199-200. With regard to potential hardship, the court also observed that "there is nothing in the record indicating that [Arab Bank] faces a real risk of prosecution" were it to disclose the material protected by the bank secrecy laws. Id. at 197. Nor did the "record show that defendant or its employees have been prosecuted for the Bank's voluntary productions in other cases." Id. (emphasis removed).

Having reviewed the decisions of the Magistrate Judge and the District Court, we turn now to defendant's arguments. Arab Bank takes issue with what it alleges are a number of distinct factual and legal errors in the District Court's balancing analysis. We review these arguments separately and then evaluate the District Court's overall weighing of these factors in issuing sanctions, mindful that our review here is focused on determining whether Arab Bank has demonstrated a "clear and indisputable" right to the writ.

### a. International Comity

International comity is a consideration guiding courts, where possible, towards interpretations of domestic law that avoid conflict with foreign law. In re Maxwell Commc'n Corp., 93 F.3d 1036, 1046-48 (2d Cir. 1996). Comity "is neither a

35

matter of absolute obligation . . . nor of mere courtesy and good will," but is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." Id. at 1046 (quoting Hilton v. Guyot, 159 U.S. 113, 163-64 (1895)). In general, the careful application of Restatement § 442 will faithfully adhere to the principles of international comity. See Aérospatiale, 482 U.S. at 544 n.28 (noting that the Restatement factors suggest "[t]he nature of the concerns that guide a comity analysis").

Arab Bank argues that the District Court's decisions ordering production and imposing sanctions should be vacated because they offend international comity. This argument derives from the notion that the sanctions force foreign authorities either to waive enforcement of their bank secrecy laws or to enforce those laws, and in so doing create an allegedly devastating financial liability for the leading financial institution in their region. The Bank asserts, further, that international comity principles merit special weight here because the District Court's decisions affect the United States' interests in combating terrorism and pertain to a region of the world pivotal to United States foreign policy.

The District Court's explication of the foreign states' interests in enforcing the bank secrecy laws were, perhaps, spare. But the District Court's opinions did not reflect a disregard for those interests. To the contrary, the court expressly noted that it had "considered the interests of the United States *and* the foreign

36

jurisdictions whose foreign bank secrecy laws are at issue." Linde V, 269 F.R.D. at 208 (emphasis added). Its request that the Bank seek permission of the foreign authorities also evidences its due regard for comity concerns.

Additionally, international comity calls for more than an examination of only *some* of the interests of *some* foreign states. Rather, as the Supreme Court explained in Aérospatiale, "the concept of international comity" requires a "particularized analysis of the respective interests of the foreign nation and the requesting nation." 482 U.S. at 543-44 (footnote omitted). In other words, the analysis invites a weighing of *all* of the relevant interests of *all* of the nations affected by the court's decision. The opinions of the Magistrate Judge and the District Court recognized the legal conflict faced by Arab Bank and the comity interests implicated by the bank secrecy laws. See Linde III, 463 F. Supp. 2d at 313-14. But they also observed – and properly so – that Jordan and Lebanon have expressed a strong interest in deterring the financial support of terrorism, and that these interests have often outweighed the enforcement of bank secrecy laws, even in the view of the foreign states. See id. at 315 n.5 ("Both Jordan and Lebanon have signed a Memorandum of Understanding Between the Governments of the Member States of the Middle East and North Africa Financial Action Task Force Against Money Laundering and Terrorist Financing, November 30 2004 . . . adopt[ing] Forty Recommendations on Money Laundering . . . [including] provisions which specifically renounce bank secrecy as a basis for refusing requests for mutual legal assistance in money laundering and terrorist financing investigations."). Moreover,

37

the Magistrate Judge and the District Court took into account the United States'

interests in the effective prosecution of civil claims under the ATA. See id. at 315.

This type of holistic, multi-factored analysis does not so obviously offend

international comity so as to support issuance of a writ of mandamus.

Furthermore, the District Court properly recognized that the interests of the

United States weigh heavily in this case, even though it is a private lawsuit brought

by individual victims of terrorism. In Minpeco, the district court ordered the

production of documents relevant to private antitrust, commodities fraud, and

racketeering claims despite the defendant's assertion that the documents were

protected by foreign bank secrecy laws. 116 F.R.D. at 523-24. The court there

recognized that had the case before it been a governmental enforcement action, it

would "accord some deference to the determination of the Executive Branch . . . that

the adverse diplomatic consequences of the discovery request would be outweighed

by the benefits of disclosure." Id. at 523 (internal quotation marks omitted). The

court also observed, however, that private lawsuits can, by virtue of the statutory

rights upon which they rely, be so "infused with the public interest" that the

distinction between private civil suits and public enforcement actions is of reduced

significance. Id. at 524.

Like the antitrust, commodities fraud, and racketeering laws at issue in

Minpeco, the ATA's legislative history reflects that Congress conceived of the ATA,

at least in part, as a mechanism for protecting the public's interests through private

enforcement. One of the Act's sponsors noted that the Act would ensure that

38

"justice [is] sought" against terrorists "even if not by [foreign governments or] the United States." 137 Cong. Rec. S. 1771 (daily ed. Feb. 7, 1991) (Senator Grassley commenting after enactment). Furthermore, he declared that the Act would "empower[ ] victims with all the weapons available in civil litigation, including: [s]ubpoenas for financial records, [and] banking information [of alleged terrorists]." Id. The District Court here appropriately recognized the important U.S. interests at stake in arming private litigants with the "weapons available in civil litigation" to deter and punish the support of terrorism. Id.

In light of the particularly deferential standard of review applicable here, we find no clear abuse of discretion in the District Court's conclusion that the interests of other sovereigns in enforcing bank secrecy laws are outweighed by the need to impede terrorism financing as embodied in the tort remedies provided by U.S. civil law and the stated commitments of the foreign nations.

### b. Arab Bank's Good or Bad Faith

Arab Bank also takes issue with several of the factual findings upon which the District Court based its determination that Arab Bank had not acted "with the utmost good faith."

First, Arab Bank contests the District Court's characterizations of Arab Bank's disclosures of evidence related to the Saudi Committee transfers. In particular, Arab Bank argues that the District Court erroneously stated that Arab Bank had not disclosed all "internal Bank communications relating to the Saudi Committee" and that the bank had not disclosed "all Saudi Committee documents."

39

Linde V, 269 F.R.D. at 199.  In fact, the Bank maintains, the only undisclosed material related to the Saudi Committee is the private account information of the beneficiaries of the Saudi Committee's transfers.

Second, Arab Bank argues that the District Court mischaracterized its efforts to obtain waivers from the foreign states.  The District Court stated that "[d]efendant's letters requesting permission from foreign banking authorities to disclose information protected by bank secrecy laws are not reflective of an 'extensive effort' to obtain waivers. . . . Instead, the letters were calculated to fail." Id.  In arriving at this conclusion, the District Court cited to one of the letters that Arab Bank had sent to foreign authorities seeking permission to produce information covered by bank secrecy laws – a 2006 letter to the Lebanese Special Investigation Commission ("LSIC").  See id.  That letter stated, among other things, that plaintiffs' claims had "no basis in reality or law," even though the District Court had denied defendants' motion to dismiss.  Id. (internal quotation marks omitted).  As Arab Bank asserts, however, this letter was not the only communication Arab Bank made to foreign authorities.  As discussed above, in 2005, the Bank requested that the LSIC grant the Bank permission to disclose information related to a single bank account in Lebanon, and the LSIC granted the Bank this permission.  Further, in 2006, the Bank submitted requests to foreign authorities for permission to produce a broader swath of documents covered by the bank secrecy laws.  Among those communications that are included in the record, only the 2006 letter to the LSIC contained the language cited by the District Court.

40

Third, Arab Bank objects to the District Court's emphasis on Arab Bank's disclosure of allegedly protected information to the DOJ and the OCC, which the District Court considered evidence of Arab Bank's "selective compliance with foreign bank secrecy laws." Id. at 200. Arab Bank contends that disclosures made pursuant to investigations by DOJ and Treasury agencies implicate different concerns than disclosures to private litigants. The Bank points to Jordan's assertion in a letter to U.S. Secretary of State Hillary Rodham Clinton following the District Court's issuance of sanctions that Jordan considers disclosures to government agencies less serious because of Jordan's "continued commitment to providing such assistance to other nations for law enforcement or national security purposes." Appellant's Br. at 60.

Even were we to assume that in these three ways the District Court overstated the record support for its finding that Arab Bank had not acted with the "utmost good faith," we would still not issue a writ of mandamus here. The District Court's finding that the Bank had not acted with the "utmost good faith" was based in large part on the uncontested observation that the discovery dispute had resulted in "years of delay." Linde V, 269 F.R.D. at 200. Arab Bank's challenges to the District Court's characterizations of the Bank's efforts to obtain a waiver from Lebanese authorities, limited disclosures of Saudi Committee materials, and prior productions to U.S. governmental authorities do not alter this fundamental fact. Furthermore, although Arab Bank has indeed disclosed some requested documents, particularly material related to the Saudi Committee, the District Court's rejection

41

of Arab Bank's assertion that the bank secrecy laws provided a reasonable basis for resisting production of the withheld materials does not "clearly and indisputably" entitle the Bank to a writ of mandamus.

### c. Hardship

Arab Bank also argues that the District Court erred in determining that Arab Bank did not face a substantial hardship if it produced the information at issue when the court found "there is nothing in the record indicating that defendant faces a real risk of prosecution." Id. at 197.

Although government officials from Jordan, Lebanon, and the Palestinian Monetary Authority submitted letters to the District Court declaring that Arab Bank would face legal action if it violated national bank secrecy laws, the record (as highlighted by the District Court) does not show "that defendant or its employees have been prosecuted for the Bank's voluntary productions in other cases." Id. (emphasis removed). Indeed, there is no evidence that Arab Bank ever sought – or even had to seek – waivers for the disclosures to the OCC or the DOJ or that Arab Bank was ever prosecuted for these disclosures. As discussed above, foreign states may face different considerations when deciding whether to prosecute banks for disclosing sensitive materials to foreign governments than when deciding to prosecute banks for the disclosure of such materials to private civil litigants. In other words, it does not necessarily follow from the foreign states' decisions not to prosecute the disclosures to the OCC and DOJ that Arab Bank will not be prosecuted for disclosing the materials at issue here. But the converse is also not

42

necessarily true: The foreign states would not necessarily prosecute the Bank or any of its employees for the disclosure of sensitive banking information to private civil litigants in the context of the current proceedings. In any event, as the Supreme Court made clear in <u>Rogers</u> and <u>Aérospatiale</u>, the mere threat of criminal prosecution abroad does not strip our courts of the authority to order production of relevant materials in private civil litigation. Any error in this regard does not amount to a clear abuse of discretion establishing entitlement to the writ.

* * *

In sum, the District Court's account of the history of this litigation and Arab Bank's efforts to disclose materials may, in some respects, be subject to legitimate debate. But none of the District Court's alleged errors so fatally undermines its conclusions as to any of the factors of the multi-faceted balancing analysis so as to support issuance of a writ of mandamus.

The District Court's decisions here to compel production and then to issue sanctions for the Bank's failure to comply find sufficient support in cases from this Court and other courts of appeals compelling discovery, notwithstanding competing foreign legal obligations. <u>See, e.g.</u>, <u>United States v. Davis</u>, 767 F.2d at 1035-36 (concluding, in affirming discovery order, that U.S. interest in enforcing criminal laws outweighed Cayman Islands' interest in bank secrecy); <u>United States v. Bank of Nova Scotia</u>, 691 F.2d 1384 (11th Cir. 1982) (upholding contempt order for failing to produce documents protected by foreign bank secrecy laws in response to grand jury subpoena); <u>United States v. First Nat'l City Bank</u>, 396 F.2d 897 (2d Cir. 1968)

43

(same).  Following this approach, district courts in this Circuit in previous ATA cases have required banks to produce materials assertedly protected by foreign bank secrecy laws.  See Strauss v. Credit Lyonnais, S.A., 249 F.R.D. 429, 456 (E.D.N.Y. 2008); Weiss v. Nat'l Westminster Bank, PLC, 242 F.R.D. 33, 57-58 (E.D.N.Y. 2007).  And where district courts have decided not to order such discovery, they have engaged in a careful analysis addressing both the interests of the parties and the relevant foreign states along with the relative importance of the evidence subject to discovery.  See Minpeco, 116 F.R.D. at 529 (denying motion to compel because "[m]ost important among the[ ] countervailing [factors at stake] . . . is the reduced degree of importance of the requested discovery in light of the waivers of bank secrecy already executed by . . . key players [in the case]").

These cases illustrate the multitude of considerations facing courts deciding whether to compel discovery and impose sanctions in the face of competing legal dictates of foreign nations.  The District Court concluded, in line with this precedent, that the importance of the documents, the lack of available alternative means to obtain them, the specificity of the discovery requests, and, finally, the important U.S. and international interests in preventing the financial support of terrorist organizations weigh in favor of producing the material at issue.  Records concerning accounts held at the Bank and documents related to the Saudi Committee are directly relevant to whether Arab Bank knowingly provided banking services in support of terrorist operations and are thus essential to plaintiffs' case.  Arab Bank has unique access to the records and only Arab Bank can make a

44

complete production. The Bank does not have a "clear and indisputable" right to the writ to correct the District Court's balancing.

## 2. Due Process

Arab Bank also argues that it is entitled to a writ of mandamus because the sanctions imposed violate its right to due process by, it maintains, effectively eviscerating its chance to present a meaningful defense in the District Court proceedings. Raising the specter of a "show trial" and positing the inevitable determination of liability, Arab Bank suggests that imposing these sanctions is tantamount to entering a default judgment against the Bank. Arab Bank protests that it attempted in good faith to comply with its discovery obligations and that, in light of its good faith, the sanctions imposed were unduly harsh. To allow the jury to infer its culpable intent, Arab Bank maintains, would offend due process because (in its view) the record does not support the conclusion that the undisclosed records would show that it knowingly facilitated terrorism. None of these arguments, however, demonstrates a "clear and indisputable" entitlement to a writ of mandamus.

Due process allows courts to impose, pursuant to Rule 37(b), such sanctions "as are just" on parties that defy discovery orders. See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinée, 456 U.S. 694, 707 (1982) ("A proper application of Rule [37(b)] will, as a matter of law," be presumed to comply with due process). With the exception of the Rogers Court's admonition that Rule 37 does not "authorize dismissal of [a] complaint because of [a party's] noncompliance with a

45

pretrial production order when . . . that failure to comply [is] due to inability and not to willfulness, bad faith, or any fault of petitioner," 357 U.S. at 212, there are few bright-line rules for determining whether a sanction is proper. Case law from the Supreme Court and our Court teaches that in imposing sanctions such as those at issue here, the district courts should weigh, among other factors, the harshness of the sanctions, the extent to which the sanctions are necessary to restore the evidentiary balance upset by incomplete production, and the non-disclosing party's degree of fault. See Ins. Corp. of Ireland, 456 U.S. at 707; Rogers, 357 U.S. at 213; S. New Eng. Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 147 (2d Cir. 2010); Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 139 (2d Cir. 2007); Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002); Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1068 (2d Cir. 1972) (concluding that gross negligence supported district court's decision to impose sanctions amounting to default judgment on one of the plaintiff's claims).

As an initial matter, Rule 37(b) permits sanctions even harsher than those imposed by the District Court here, including, for example, an order directing that "designated facts be taken as established" or "rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(i),(iv). Contrary to Arab Bank's calls of alarm, the sanctions order (as we have observed) does *not* amount to default judgment or otherwise *require* that the jury find certain facts. To be sure, the inferences the jury will be entitled to draw – along with the District Court's

46

preclusion sanction here – will adversely affect Arab Bank's ability to mount a defense at trial. But, as we have observed, Arab Bank will still be entitled to emphasize its substantial Saudi Committee disclosures, including the Bank's own internal documentation, to persuade a jury that it was not aware that the beneficiaries of its financial services were terrorists. Arab Bank could rely on these disclosures, and related testimony, to rebut plaintiffs' assertion that Arab Bank intended to support the Saudi Committee's alleged efforts to finance terrorists, and urge the jury to extrapolate from this evidence that Arab Bank had lacked a culpable state of mind with regard to the other transfers at issue.

Arab Bank also argues, however, that the state-of-mind sanction was not reasonably related to the Bank's failure to comply with the discovery order and therefore was not proper. This argument, too, fails to support issuance of a writ of mandamus. The Supreme Court's decision in Insurance Corp. of Ireland makes clear that a court may instruct a jury to presume the truth of a factual allegation from a party's failure to produce material relevant to that allegation. 456 U.S. at 705; see also S. New Eng. Tel. Co., 624 F.3d at 147 (discussing Insurance Corp. of Ireland).

In addition, as described in detail in the District Court's opinion, the record includes documents reflecting transfers "approved" by Arab Bank to Hamas or individuals associated with Hamas, as well as evidence that the Bank processed payments the Saudi Committee made to family members of individuals linked to terrorism. See Linde V, 269 F.R.D. at 203. The existence of these documents could

47

support the conclusion that Arab Bank provided banking services to terrorist groups, and that the withheld documents would provide further evidence that it provided such services. Further, a significant volume of documents showing that Arab Bank provided banking services to terrorist organizations could constitute strong circumstantial evidence that it did so knowingly and purposefully. Documentation related to bank accounts allegedly held by terrorist organizations and payments made by the Saudi Committee that Arab Bank refused to produce is, thus, reasonably related to the issue of the Bank's state of mind.

Finally, although the District Court here need not have found the same degree of fault as would be required to support a default judgment, we can hardly conclude that Arab Bank was faultless. The District Court did not clearly err in determining that Arab Bank's production efforts did not evince the "utmost good faith." The combination of the Bank's long delay in the District Court, partial production in the U.S. government investigations (in contrast), and apparent unwillingness to pursue permission to produce materials covered by the narrowly-tailored discovery orders further support the District Court's sanctions order, which, unlike the default judgment at issue in Rogers, allows the Bank to mount a defense at trial.

The sanctions at issue here are substantial, but, at least for the purpose of our deferential inquiry here, they find adequate support in Arab Bank's failure to produce and the resulting evidentiary imbalance, and they do not preclude the Bank from defending itself at trial. For these reasons, too, Arab Bank has fallen short of demonstrating that it is "clearly entitled" to the writ.

48

## B.    Review After Final Judgment Will Provide Adequate Relief

Arab Bank presents a number of arguments in support of its contention that issuance of the writ is the only adequate means for it to attain the relief that it is due.  These arguments fall into two distinct categories.  First, as reviewed in our discussion of interlocutory review, Arab Bank argues that the sanctions order causes it irreparable harm by rendering it essentially inevitable that the jury will find the Bank liable on plaintiffs' claims, which will cause it to be labeled a terrorist sympathizer and to experience substantial reputational harm.  According to Arab Bank, such a verdict would make it difficult for the Bank to "survive long enough to take an appeal." Appellant's Br. at 19.   Second, Arab Bank argues that if the sanctions order stands, foreign states will be irreparably harmed because bank customers will form the impression that U.S. courts can force banks in the region to disclose private information notwithstanding the protections promised by those states' bank secrecy laws.

Arab Bank's first argument is based on speculation and reflects a misapprehension of what constitutes "irreparable harm" for purposes of mandamus review.  It is true that if the jury were to in fact infer knowledge and purpose based on the District Court's permissive instructions, Arab Bank might have difficulty avoiding liability on plaintiffs' claims.  See, e.g., Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 68 & n.20 (2d Cir. 2012).  But a jury instruction involving permissive adverse inferences is not a default judgment; instead, it is a calibrated device imposed by district courts to address specific discovery violations

49

after considering the seriousness of the violations, the course of the litigation, and the legal issues at stake in the case. See, e.g., Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 383 (2d Cir. 2001). The sanctions order notwithstanding, it is at this point hardly certain that, after trial, the jury will find against Arab Bank.

Furthermore, the type of harm that is deemed irreparable for mandamus purposes typically involves an interest that is both important to and distinct from the resolution of the merits of the case. For example, we have issued writs of mandamus in cases where district courts have incorrectly determined that highly sensitive privileged materials are discoverable. See, e.g., City of New York, 607 F.3d at 934 (issuing writ of mandamus to prevent disclosure of confidential reports prepared by undercover New York City Police Department officers that were covered by law-enforcement privilege). By contrast, in this case, the harm that Arab Bank would experience from an adverse judgment is in essence indistinguishable from the harm experienced by other litigants who lose a battle in a lower court and seek appellate review. Issuing a writ of mandamus to correct an error on the basis of the harm to the Bank alleged here would suggest that the writ is available to any party concerned about the delay between an adverse trial judgment and vindication on appeal. But as the Supreme Court has cautioned, the writ "is not to be used as a substitute for appeal, even though hardship may result from delay . . . ." Schlagenhauf v. Holder, 379 U.S. 104, 110 (1964) (internal citation omitted).

50

Second, with the support of its amici, Arab Bank argues that allowing the sanctions to remain in place will harm foreign states by signaling that the privacy offered by their bank secrecy laws could be eroded by U.S. courts that order disclosure of protected material. Such a development, Arab Bank and amici predict, will result in customers fleeing these countries' banking systems and ensuing "financial and political destabilization, which can only undermine the fight against terrorism." Appellant's Br. at 20. This reasoning, also, is overly speculative and the harm alleged too indirectly related to the sanctions at issue here to support a petition for a writ of mandamus. If anything, Arab Bank's decision not to disclose the relevant materials may signal to bank customers that banks will *not* disclose private information despite discovery orders issued by U.S. courts.

Arab Bank's reliance on cases like In re Philippine National Bank, 397 F.3d 768 (9th Cir. 2005), and Credit Suisse v. U.S. District Court, 130 F.3d 1342 (9th Cir. 1997), is misplaced. In those cases, another court of appeals issued writs of mandamus at the request of parties found in civil contempt for failing to disclose information in violation of the laws of foreign states. But in those cases, the contempt orders had placed the petitioners in the position of "having to choose between being in contempt of court for failing to comply with the district court's order, or violating [foreign] banking secrecy and penal laws by complying with the order." Id. at 1346; In re Philippine Nat'l Bank, 397 F.3d at 774. Arab Bank does not face the same quandary. Civil contempt sanctions "force the contemnor to comply with an order of the court," Willy v. Coastal Corp., 503 U.S. 131, 139 (1992),

51

and are inherently "contingent and coercive." OSRecovery, Inc. v. One Groupe Int'l, Inc., 462 F.3d 87, 93 n.2 (2d Cir. 2006). By contrast, the sanctions imposed here are retrospective: they are directed at the decision Arab Bank has already made to defy the orders, and the District Court has never suggested that it will lift the sanctions if Arab Bank produces more materials. See Cunningham, 527 U.S. at 207-08. The question, then, is not whether Arab Bank faces irreparable harm resulting from violation of foreign law, but, rather, whether the sanctions themselves will cause irreparable harm to Arab Bank. They will not.

Finally, we observe that this Court has recently issued writs of mandamus to resolve discovery disputes involving the production of sensitive materials. See, e.g., Rajaratnam, 622 F.3d 159; City of New York, 607 F.3d 923. In those cases, we observed that the petitioning parties had "no other adequate means to attain . . . relief" because "a remedy after final judgment cannot unsay the confidential information that has been revealed." City of New York, 607 F.3d at 932, 934 (internal quotation marks omitted). We do not have the same acute sense of irreversibility here. The privacy interests protected by the bank secrecy laws may be at issue – although they may not carry the same weight as the interests at stake in recent cases where we have granted the writ – but the Bank does not stress, nor could we conclude, that the importance of protecting these interests is a reason for determining that "review after final judgment is not a viable option." Appellant's Br. at 19. Instead, the Bank appears concerned primarily with avoiding the harm arising from a possible adverse judgment.

52

For all these reasons, Arab Bank has failed to establish that a writ of mandamus is the only means available for it to obtain effective review of the sanctions order. Appellate review provided in the ordinary course will amply serve the interests of the Bank and the foreign states whose bank secrecy laws may protect the undisclosed materials.

### C.     Mandamus is Not Appropriate Under the Circumstances

This Court has "expressed reluctance to issue writs of mandamus to overturn discovery rulings." City of New York, 607 F.3d at 939 (internal quotation marks omitted). Thus, "[t]o determine whether mandamus is appropriate in the context of a discovery ruling, we look primarily for the presence of a novel and significant question of law and the presence of a legal issue whose resolution will aid in the administration of justice." Id. (internal quotation marks and ellipsis omitted).

Cases from the Supreme Court and our Court involving petitions for writs of mandamus to review discovery-related orders help to illustrate when the issues raised in such a petition are sufficiently novel, discrete, and important to justify issuance of the writ. In Schlagenhauf v. Holder, 379 U.S. 104 (1964), the Supreme Court issued a writ of mandamus to review a district court's order requiring an individual defendant to submit to mental and physical examinations. Because the case hinged on an important threshold "issue of first impression" as opposed to a fact-intensive balancing of whether "good cause had been shown," the Supreme Court deemed the mandamus petition "properly before the [appellate] court on a substantial allegation of usurpation of power." Id. at 111.

53

Similarly, as explained above, we have issued writs of mandamus to review novel, discrete, and important legal issues involving the disclosure of sensitive information. In City of New York, the City sought a writ of mandamus to correct a district court's order that the New York City Police Department turn over "field reports" produced by undercover police officers, which were potentially covered by the law-enforcement privilege. 607 F.3d at 929. In deciding that a writ was "appropriate under the circumstances," we concluded that the petition raised a number of "novel and significant questions of law," including "how a court should determine whether" information covered by the "qualified" law-enforcement privilege must "nevertheless be disclosed." Id. at 941 (brackets and emphasis omitted). Issuing the writ in that case would "aid in the administration of justice" by providing "guidance for the courts of our Circuit in an important, yet underdeveloped, area of law." Id. at 942.

In Rajaratanam, we addressed whether a defendant in a civil enforcement action could be required to produce inculpatory wiretap evidence obtained by the United States government in a criminal investigation against him. See 622 F.3d at 165. In deciding that the writ was appropriate in the circumstances there presented, we explained that the precise issue before us had never been addressed by our Court and stressed "the importance of both the privacy rights at stake and the public interest in civil enforcement of the law." Id. at 171.

By contrast, we have refused to issue the writ to correct a district court's order that a party produce "reports made by a Special Investigative Unit" for the

54

party's internal counsel and therefore assertedly covered by attorney work-product privilege. See American Express Warehousing, Ltd. v. Transamerica Ins. Co., 380 F.2d 277, 278-79 (2d Cir. 1967) ("Transamerica"). There, the bases for the district court's order "involve[d] application of well-known law to commonplace fact and rested on the district judge's appraisal of facts and exercise of discretion." Id. at 283. Under these circumstances, we saw "no good reason to allow the extraordinary writ." Id. at 284.

The questions Arab Bank asks us to resolve are more similar, we think, to those at issue in Transamerica than those at issue in Rajaratnam and City of New York. As discussed above, the underlying merits of Arab Bank's assertions involve the application of a well-elaborated legal scheme and a fact-intensive inquiry in the midst of ongoing, lengthy litigation. See Strauss, 249 F.R.D. at 456; Weiss, 242 F.R.D. at 57-58; Minpeco, 116 F.R.D. at 529. In this context, absent a demonstration that the district court has "flagrantly misappli[ed]" the law, City of New York, 607 F.3d at 940 n.17, we are unlikely to issue the writ.

As we have reviewed here in detail, the District Court applied the existing legal framework, including Restatement § 442, in weighing plaintiffs' need for the required discovery and the lack of alternative means to obtain it against the interests of foreign states in enforcing their bank secrecy laws and the hardship faced by Arab Bank because of its conflicting legal obligations. The court applied many of the same factors, along with others developed by courts in various jurisdictions, in deciding whether to impose sanctions. The application of § 442's

55

balancing test in such a fact-intensive setting does not present a novel legal issue with respect to which we can "aid in the administration of justice" by further clarifying the applicable standards. <u>City of New York</u>, 607 F.3d at 939. We deem it unwise and unnecessary to interrupt the progress of the litigation before the District Court by issuance of the writ.

## CONCLUSION

In sum, the District Court's order imposing discovery sanctions against Arab Bank under Rule 37 is an interlocutory order over which we do not have jurisdiction. Accordingly, we DISMISS the appeal in No. 10-4519. Further, Arab Bank is not entitled to a writ of mandamus vacating the sanctions order. The Bank's petition for a writ of mandamus in No. 10-4524 is DENIED.